IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GREGORIO COLIN, M53575, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 19-cv-494-DWD |
| | ) |
| MR. GERST, | ) |
| DR. GARCIA, | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Gregorio Colin, an inmate of the Illinois Department of Corrections (IDOC) currently incarcerated at Big Muddy River Correctional Center (Big Muddy), brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while at Big Muddy. Plaintiff alleges the defendants were deliberately indifferent to his broken foot, and their deliberate indifference caused his injury to heal incorrectly. The Defendants' filed a timely Motion for Summary Judgment (Doc. 48), Plaintiff responded (Doc. 50), and the Defendants' replied (Doc. 52). The matter is now ripe for consideration.

### PROCEDURAL HISTORY

Plaintiff initiated this case by filing a complaint on May 10, 2019. (Doc. 1). Upon initial review, the Court identified one valid claim:

> Claim 1: Eighth Amendment claim for deliberate indifference to a serious medical need against all Defendants.

After review, the Claim was allowed to proceed against Defendants Gerst and Garcia, but it was dismissed as to Larson, Sullivan, and Wexford Health Source, Inc.. (Doc. 9).

The complaint was served upon the defendants. On February 18, 2020, the defendants withdrew their affirmative defense concerning exhaustion of administrative remedies (Doc. 29), and counsel was appointed for Plaintiff. The case proceeded to merits discovery.

## FACTS

On July 21, 2018, Plaintiff injured his left foot while playing soccer during yard time at Big Muddy. Plaintiff felt immediate pain, and he had immediate swelling and bruising of his left foot and ankle. With assistance, Plaintiff walked back to his wing. Within five minutes of returning to his wing, an officer allowed him to go to the healthcare unit. At the healthcare unit a non-party nurse examined Plaintiff's ankle, and although she allegedly denied that he was in pain, she provided Tylenol, ice, and crutches. Plaintiff claims the Tylenol did not help his pain. Plaintiff reports that the pain was extreme and that he could not walk without the crutches.

On July 24, 2018, Plaintiff saw Defendant Gerst, a nurse practitioner, for his injury based on a referral from the nurse who examined him on July 21. The Defendants claim that Plaintiff reported positive relief from the ibuprofen the nurse gave him, (Def. SUMF, Doc. 49 at 3, ¶ 9), although Plaintiff alleges that the ibuprofen did not relieve his pain. (Pltf. SUMF, Doc. 50 at 2, ¶ 8). Gerst examined Plaintiff's ankle and noted tenderness and inflammation with decreased dorsiflexion secondary to pain. He ordered x-rays and

directed Plaintiff to continue the crutches, to be non-weight bearing, and to take 400mg of ibuprofen every eight hours for a month. Gerst noted in Plaintiff's medical chart that Plaintiff was "NAD," meaning not in apparent distress.

On July 26, 2018, Plaintiff received an x-ray, which revealed a fracture along the base of his fifth metatarsal (the bone behind the smallest toe). On the same day, Plaintiff was seen by Big Muddy's Dr. Larson. After examining Plaintiff's foot, Dr. Larson ordered low bunk and low gallery permits, crutches for short distances, a wheelchair for longer distances, and an orthopedic glass splint. The splint was implemented at the appointment. Dr. Larson also put Plaintiff's file into collegial review to consider if he should be taken to an orthopedic specialist.

On August 3, 2018, Dr. Larson and Defendant Dr. Garcia conducted the collegial review. At the time of the collegial review, Dr. Garcia was the national medical director for Wexford Health Sources, Inc., and during collegial reviews he was responsible for helping onsite doctors to determine if offsite care was appropriate. During the collegial review of Plaintiff's case, Drs. Larson and Garcia determined that offsite treatment was not yet necessary. This decision was based on the ongoing course of care that had already been implemented, as well as Dr. Larson's report that on the x-ray the bone appeared to be in good alignment. As a back-up to the ongoing treatment plan, Drs. Larson and Garcia agreed that Plaintiff should have a follow-up x-ray to monitor progress, and his case should be raised again at collegial review as necessary.

Plaintiff had a follow-up x-ray on August 8, 2018, which revealed a nondisplaced fracture with no significant change. Plaintiff was still in a cast. On August 9, 2018, Dr.

Larson put Plaintiff in for another collegial review, and during that collegial review Drs. Larson and Garcia approved an offsite visit because Plaintiff continued to complain of pain. Pain from a fractured bone of this nature, or from a soft tissue injury, typically begins to resolve in a month. At the time of the second collegial review on September 14, 2018, the injury was eight weeks old, so the doctors felt an outside referral was appropriate.

On September 24, 2018, Plaintiff was seen offsite by Dr. Alan Froehling. Dr. Froehling completed new x-rays and noted that there was advanced healing, though there could be some associated ligamentous injury in the cuneiform area. He noted that Plaintiff was on the mend and he opined that Plaintiff could discontinue the splint and he could begin weight bearing as tolerated. Dr. Froehling recommended an x-ray in a month to check progress.

On October 26, 2018, Plaintiff saw Dr. Froehling again and had new x-rays. The x-rays showed solid healing, but based on continuing complaints of pain, the doctor recommended physical therapy. He opined that there may be a soft-tissue strain associated with the healed fracture. Physical therapy began November 1, 2018.

On November 29, 2018, Plaintiff saw Dr. Froehling and continued to complain of pain. Dr. Froehling diagnosed him with peroneal tendonitis and noted his fracture was healed. He directed ongoing physical therapy. On December 20, 2018, Dr. Froehling reviewed additional x-rays and noted that it was unusual for there to be continued symptoms at that stage of an injury. On December 28, 2018, Dr. Froehling recommended an MRI to further investigate ongoing tenderness.

Dr. Larson submitted the MRI suggestion to collegial review, and it was approved on January 16, 2019.  On February 22, 2019, an MRI produced findings consistent with a split tendon tear, with a tendon interposed between two split halves.  On April 12, 2019, Dr. Froehling performed an injection of Kenalog and Xylocaine into the injured tendon.  On May 6, 2019, Plaintiff reported to Dr. Froehling that his pain had not improved.  Dr. Froehling suggested a second opinion, Dr. Larson sent the recommendation to collegial review, and on May 15, 2019, a second opinion visit was approved.

On July 9, 2019, Plaintiff saw another provider who suggested surgical repair.  On July 11, 2019, the surgery was approved by collegial review, and on July 31, 2019, Plaintiff received surgery.  Despite the surgery, Plaintiff continues to experience pain, and he still walks with a cane.

In support of the motion for summary judgment, Defendants submitted Plaintiff's deposition (Doc. 49-1), Dr. Froehling's deposition (Doc. 49-5), affidavits from Gerst (Doc. 49-3) and Dr. Garcia (Doc. 49-4), and Plaintiff's medical records (Doc. 49-2).  Plaintiff submitted a copy of Wexford's internal Orthopedic Surgery Guidelines (Doc. 51).

At his deposition, Plaintiff testified that on the day of the injury, a nurse gave him Tylenol, which did not help his pain, she gave him ice, which helped a little bit, and she gave him crutches.  (Pltf. Dep., Doc. 49-1 at 21-22).  Three days later, on July 24, 2022, Plaintiff saw Defendant Gerst.  Plaintiff stated that he did not remember much about his appointment with Gerst, and he did not know if Gerst scheduled x-rays.  (*Id.* at 24-25).  Plaintiff remembered that Gerst told him to use the crutches he had.  (*Id.* at 26).  He took the Tylenol Gerst prescribed, but he stated that it did not help his pain.

On July 26, 2022, Dr. Larson told Plaintiff that his foot was broken based on x-rays taken that day. (Pltf. Dep. At 28). Dr. Larson gave Plaintiff a wheelchair to use in addition to the crutches, and he also issued low bunk and low gallery permits. Plaintiff later learned that Larson had suggested he get an outside orthopedic consult, but that the consult was denied. (*Id.* at 28-31).

Plaintiff stated at his deposition that when he eventually saw an outside doctor, the doctor told him it was too late to cast his foot. (Pltf. Dep. At 33). Upon the doctor's recommendation, Plaintiff said he did physical therapy at least two times a week for quite a while. (*Id.* at 33-34).

Plaintiff's medical chart shows that on July 24, 2018, he was seen for a follow-up from July 21, 2018, when he hurt his ankle playing soccer. (Doc. 49-2 at 1). The handwriting is difficult to read. The notes say, patient is to utilize crutches given by nursing until seen for a follow-up and radiology report, and the patient is to be non-weight bearing. Plaintiff was prescribed 400mg of ibuprofen every eight hours for a month. Notes from July 26, 2018, indicate that x-rays were completed, and Plaintiff had a fracture of his fifth metatarsal. (*Id.* at 2).

In an affidavit, Gerst, indicated that Plaintiff reported positive relief from the ibuprofen the nurse gave him three days prior to their appointment, and Plaintiff was not in any apparent distress. (Doc. 49-3 at 2). He did not prescribe stronger pain medication, nor did he recommend emergency medical care, because he did not believe Plaintiff was in serious pain. He observed an injury to Plaintiff's left foot, so directed that Plaintiff be non-weight bearing until an x-ray could be performed.

By affidavit, Dr. Garcia he completed a collegial review of Plaintiff's file with Dr. Larson on August 3, 2020. At that time, Dr. Larson reported a fifth metatarsal fracture, but noted that there was good bone alignment. Given the alignment and the treatment protocol already in place (including a wheelchair and splint), Dr. Garcia did not believe that a surgical referral was necessary at that time. (Doc. 49-4 at 2). Fractures of this nature are common, and they sometimes involve damage to surrounding soft tissues, but both injuries can and typically do heal without intervention if the patient is non-weightbearing and follows other treatment recommendations. (*Id.* at 3). Typically, over-the-counter pain medications are used to treat injuries of this type because opioids pose a risk of addiction. On the second collegial review, Plaintiff's x-ray showed no significant changes, but he was approved for an outside specialist visit because he reported continued pain. (*Id.* at 3-4).

Dr. Froehling, the outside orthopedic specialist participated in a deposition. (Doc. 49-5). Froehling testified that when he first saw Plaintiff there was new bone formation over the nondisplaced fracture. (Doc. 49-5 at 8). Generally, an injury of this nature can heal within six weeks or so, and it is very uncommon that this injury requires surgical intervention. Injuries of this nature often involve soft tissue damage, which also tends to heal on its own. (*Id.* at 20). Typically, Dr. Froehling would perform an x-ray and offer a boot or splint for this type of injury, but the lack of boot or splint generally would not cause additional problems unless the injury became displaced. (*Id.* at 9-12). By October of 2020, x-rays showed that Plaintiff's bone had healed, but he continued to complain of pain, so Dr. Froehling saw him for additional appointments. In December of 2020, faced

with complaints of ongoing pain, but unable to detect instability in the joint, Froehling ordered an MRI. (*Id.* at 14). The MRI revealed some tendon damage, so Dr. Froehling offered a cortisone injection, and later referred Plaintiff to a colleague. (*Id.* at 14-15).

## CONCLUSIONS OF LAW

### A. Legal Standards

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In determining a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted). Courts generally cannot resolve factual disputes on a motion for summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citation omitted). The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett*, 658 F.3d at 750; *accord*, *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). It is not necessary for such a medical condition to "be life-threatening to

be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *accord*, *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm") (internal quotation marks omitted) (emphasis added).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *See Greeno*, 414 F.3d at 653. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409. Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (*citing Gayton*, 593 F.3d at 620).

The Seventh Circuit has noted a subclass of deliberate indifference cases where an inmate does not claim that his medical issue was ignored, and instead argues that he received constitutionally deficient care for an injury or condition. *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019). These cases are best described as "a challenge to a deliberate decision by a doctor to treat a medical need in a particular manner." *Id.*, citing *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 2008). The standard, "reflects the reality that there is no single 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field. *Lockett*, 937 F.3d at 1023

(internal citation omitted). "State-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment; the defendant's persistence in a course of treatment known to be ineffective, or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice or standards that a jury may reasonably infer that the decision was not based on professional judgment. " *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016). A choice to pursue an easier or less effective course of treatment, or a non-trivial delay in treating serious pain may also support a claim of deliberate indifference. *Lockett*, 937 F.3d at 1023.

An injury need not have been specifically diagnosed to have demanded action by a medical professional. *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015). "An official may not escape liability by 'refusing to verify underlying facts that she strongly suspects to be true.'" *Id.* To demonstrate that delay caused a cognizable injury, an inmate must show that the delay either exacerbated his injury *or* that it unnecessarily prolonged the pain. *Thomas v. Martija*, 991 F.3d 763, 771 (7th Cir. 2021). In cases where prison officials delayed rather than denied treatment, the plaintiff must offer verifying medical evidence that the delay (rather than the underlying condition) caused some degree of harm. *Id.* at 749, citing *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013).

In *Goodloe v. Sood*, 947 F.3d 1026, 1032 (7th Cir. 2020), the Seventh Circuit affirmed summary judgment in favor of a doctor who consulted with a prison doctor about the appropriateness of external medical care for an inmate. The Court noted that "Dr. Fisher never directly treated Goodloe and instead played a much more limited role by

consulting on three occasions with Dr. Sood about particular care decisions. While the record may support a finding that Dr. Fisher was aware from these consults of Goodloe's unresolved pain, we do not see evidence permitting an inference that Dr. Fisher responded with deliberate indifference." Nothing showed the consulting doctor's awareness of the extent of the inmate's suffering or persistent complaints and requests for a new course of treatment. As such, the Court noted that the consulting doctor was not sufficiently aware of plaintiff's medical condition for his knowledge or treatment suggestions to constitute deliberate indifference.

B. Analysis

The Court will address each defendant individually. First, Defendant Gerst argues that he is entitled to summary judgment because he made treatment decisions consistent with years of experience as a physician's assistant, and with consideration given to the symptoms Plaintiff presented. Specifically, Gerst argues that Plaintiff told him that over-the-counter pain medications were helping his symptoms. Based on Plaintiff's swelling and pain, Gerst scheduled an x-ray, told Plaintiff to continue with the crutches, and increased his over-the-counter painkiller prescription. Two-days later, Plaintiff received an x-ray, which confirmed a broken foot, but Dr. Larson did not change the pain medication regime Gerst originally set. Based on these facts, Gerst contends that he selected an appropriate course of treatment.

Plaintiff counters that because Gerst's Motion for Summary Judgment says Gerst "suspected that [Plaintiff] may have a fracture in either his foot or his ankle," a two-day

delay to await an x-ray caused extended pain and suffering and was a course of action that no reasonably competent professional would have selected. Plaintiff argues that Gerst responded to his injury by choosing an easier and less effective course of treatment, that he cannot escape liability by claiming he did not know of the fracture at the time of treating Plaintiff, and Gerst's method of treatment violated Wexford's internal policy. Furthermore, Plaintiff argues that an inexplicable delay can give rise to deliberate indifference because it unnecessarily prolonged his pain and suffering.

In reply, Gerst argues that Plaintiff's arguments concerning Wexford's own policies are irrelevant because at the time Gerst saw Plaintiff there was no confirmed fracture, so the policies did not apply. Additionally, Gerst argues he was not responsible for personally performing x-rays, so any delay is not attributable to him. Finally, he argues that to the extent that his failure to give Plaintiff a splint could be construed as deliberate indifference, Plaintiff has not demonstrated he suffered any additional harm based on the two-day delay between the appointment with Gerst and the follow-up with Dr. Larson.

Summary judgment will be granted in Gerst's favor because his conduct did not amount to deliberate indifference to a serious medical need, nor did he cause a delay that led to further injury or suffering. The parties concede that Plaintiff's injury, a fracture of his fifth metatarsal was serious, so the Court need not consider that component of the deliberate indifference analysis. The only question is whether Gerst exhibited deliberate indifference to Plaintiff's serious injury. This is not a case where Plaintiff got no treatment, instead this is a case where Plaintiff contends that the treatment he received

was severely deficient. There is not enough evidence to create a genuine material dispute about the appropriateness of the course of care Gerst selected.

At best, Plaintiff argues that the over-the-counter pain medication that he was provided on the day of the injury did not alleviate his pain. At his deposition he testified that the medication the original nurse gave him did not alleviate his pain, but he did not testify that he actually told Gerst that his pain was untreated. Instead, he testified that he did not remember anything specific about what he told Gerst at the July 24 appointment. (Pltf. Dep., Doc. 49-1 at 26: 8-10). By contrast, in his declaration, Gerst stated that when he saw Plaintiff on July 24, Plaintiff reported that the painkiller the nurse gave him had provided positive relief. Gerst declared (Gerst Decl., Doc. 49-3 at 2, ¶5), and his medical notes reflected (Doc. 49-2 at 1) that Plaintiff was not in any apparent distress at the time of the appointment. Additionally, even when Plaintiff saw Dr. Larson, or later saw an outside specialist, his pain medication was never changed to anything other than over-the-counter medications. In light of the evidence provided by Gerst, and Plaintiff's own lack of evidence, it cannot be said that Gerst knew Plaintiff was left to suffer in pain, or that his pain was unmanaged. Without knowledge of Plaintiff's ongoing pain, Gerst's chosen course of pain-management was not deliberately indifferent.

To the extent that Plaintiff argues that Gerst unreasonably delayed his x-rays by two days, he also cannot succeed on this argument because he cannot show that additional injury resulted from any delay. Plaintiff testified at his deposition that Gerst told him to use the crutches provided earlier (Pltf. Dep. 49-1 at 26: 2-4), and the medical records show that Gerst told Plaintiff he should be non-weight bearing (Doc. 49-2 at 1).

Plaintiff did not report that he disobeyed these directions. Thus, there is no evidence that from the time of the appointment with Gerst, until the x-rays and doctor's appointment two days later, that Plaintiff suffered any additional harm.

Finally, Plaintiff's argument that Gerst violated Wexford's policy is unavailing. Even if Gerst did violate the policy, a violation of a private policy is not equivalent to a violation of the constitution. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws, or in this case, departmental regulations and police practices."). Gerst's alleged non-adherence to Wexford policy does not establish a constitutional violation, and it is not sufficient to create a genuine dispute of fact about Gerst's alleged deliberate indifference.

Turning to Dr. Garcia, the Defendants argue that he is entitled to summary judgment because the only medical decision in question is Garcia's denial of the first recommendation for an external consultation, which was based on a determination that at the time, Plaintiff was already receiving the medically appropriate course of treatment. Upon re-review on September 14, 2018, the external consultation was approved. Garcia argues that fractures often cause pain and soft tissue irritation, but for most patients, these issues resolve in a couple of weeks to a couple of months. Garcia contends that Plaintiff has not established an unreasonable delay in Garcia's response to his injury, and even if he did, he has not shown that his condition was worsened based on Garcia's involvement. Garcia adds that even if Plaintiff had seen the outside specialist sooner, that specialist (Dr. Froehling) agreed that the measures implemented at the time Garcia denied the initial external consult were the appropriate measures for Plaintiff's injury.

Plaintiff argues that Dr. Garcia knew he had a fractured foot, and he knew that despite this knowledge and the implementation of appropriate treatment, Dr. Larson still requested a collegial review and an external consultation. Plaintiff argues that this knowledge implies a decision on Garcia's part to knowingly choose an easier and less efficacious treatment, and that he delayed Plaintiff's access to expert care despite knowing that a fracture could lead to damage to the surrounding soft tissues. In support of his contention that the delay caused harm, Plaintiff analogized to the *Conley v. Birch, 796 F.3d 742 (7th Cir. 2015)*, a case wherein the Seventh Circuit found that summary judgment should not have been granted in favor of a doctor who delayed an inmate's access to x-rays or treatment for a hand fracture that healed improperly due to the delay. The Seventh Circuit noted that a jury could find that the doctor's chosen course of treatment constituted deliberate indifference. Plaintiff argues that like the doctor in *Conley*, a jury could also find that Garcia was deliberately indifference because he delayed an external consultation and allowed a minimal course of treatment to proceed.

Plaintiff has not established a genuine dispute of material fact about Garcia's conduct. Unlike the doctor in *Conley* that denied access to initial treatment to detect a fractured hand, Garcia did not delay access to initial treatment for the fracture, because the treatment had taken place before Garcia was even consulted. At the time that Garcia was initially consulted, Plaintiff had already received x-rays, pain medication, low-gallery and bunk permits, a wheelchair and crutches, and a splint. The x-rays showed that the fracture was non-displaced. Drs. Garcia and Larson chose to continue this course of treatment, and to monitor Plaintiff's healing by a follow-up x-ray. The follow-up x-ray

showed that the bone was still in good alignment, but because Plaintiff had ongoing pain, the doctors decided to initiate an outside referral after the second consultation. There is no evidence that at the time he denied the initial external referral, Dr. Garcia knew that Plaintiff was in pain or that he believed Plaintiff had any injury other than the non-displaced fracture.

Plaintiff attempts to argue that Dr. Garcia should have inferred some level of severity about the injury from the fact that Dr. Larson still requested a collegial review after implementing the pain medication, medical permits, splint, wheelchair, and crutches, but this argument of an inference is contradicted by record evidence. Specifically, Garcia declared that during the initial collegial review, Dr. Larson reported that the fracture had good bone alignment, and all of the necessary treatment modalities for an injury of this nature were already in place, so a surgical referral was not necessary. (Garcia Dec., Doc. 49-4 at 2 ¶ 6). He concluded that the issue could be re-presented at collegial review if necessary. (*Id.*).

The record also includes deposition testimony from Dr. Froehling, who stated that the standard treatment for an undisplaced fracture of this type is "reduced activity, [and] splinting or bracing. In some cases people can develop a nonunion. That didn't appear to be the case here." (Froehling Dep., Doc. 49-5 at 9: 12-16). He further stated, "[t]his type of injury, usually with the patient's slowing down and a bit of time, about six weeks or so, they are usually healed up. Unless they were to come apart and become displaced, I wouldn't expect a problem." (*Id.* at 12:2-7). The first time Dr. Froehling saw Plaintiff in September of 2018, he reviewed new x-rays and noted that the fracture was in the stage

of advanced healing, and he could see a bridge of bone (new bone formation) over the crack. (*Id*. at 8: 9-18). Dr. Froehling saw Plaintiff again on October 26, 2018, and a new x-ray showed that the bone was healed. (*Id*. at 12: 11-15). Dr. Froehling testified that at his own practice he would follow a course of care similar to what plaintiff received, including a boot or splint and non-weight bearing. Dr. Froehling's deposition testimony supports the proposition that Garcia's decision to defer an external consultation was not medically unreasonable.

In light of the evidence from Dr. Garcia and Dr. Froehling, Plaintiff has not created a genuine issue of fact about the appropriateness of Dr. Garcia's initial recommendation during the August 2018 collegial review. Plaintiff did not tender any evidence that shows that Dr. Garcia's actions were motivated by a specific subjective intent to cause harm or to delay the appropriate and necessary treatment. Summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence [he] has that would convince a trier of fact to accept [his] version of events." *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003); *Wilson v. Wexford*, 932 F.3d 513, 519 (7th Cir. 2019) (a plaintiff has a burden to submit evidence that would show a deficit in a medical provider's treatment, if a plaintiff has no evidence or expert testimony of his own, and the defendant has medical evidence that the care was appropriate, then judgment in the defendant's favor is appropriate). Even construing the record broadly in Plaintiff's favor, he has not submitted any evidence that supports his position that Dr. Garcia's recommendation during the first collegial review constituted deliberate indifference. Dr. Garcia is similarly positioned to the defendant in *Goodloe*, whom the Seventh Circuit

found did not possess the necessary knowledge to amount to a subjective intent to cause harm. *Goodloe*, 947 F.3d at 1032. Accordingly, summary judgment must be granted in favor of Dr. Garcia, because Plaintiff has not established a genuine dispute about Garcia's actions.

Based on the foregoing analysis, summary judgment will be granted to both Defendants.

## DISPOSITION

In summary, Defendants' Motion for Summary Judgment (Doc. 48) will be **GRANTED,** and this action is **DISMISSED with prejudice**. This Motion resolves all outstanding claims in this case against all parties, so the Clerk of Court is **DIRECTED** to close this case. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: August 31, 2022

							_____
							DAVID W. DUGAN
							United States District Judge